Opinion filed December 16, 2010



# In The

# Eleventh Court of Appeals

_____

## No. 11-09-00037-CR
_____

**PERRY MONTEZ JOHNSON, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

**On Appeal from the County Criminal District Court No. 2**

**Tarrant County, Texas**

**Trial Court Cause No. 1131094R**

## M E M O R A N D U M   O P I N I O N

The jury convicted Perry Montez Johnson of aggravated assault causing bodily injury. The trial court assessed his punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of fifteen years. Appellant challenges his conviction in three issues. We modify and affirm.

### Background Facts

Appellant was charged by three counts in the indictment with assaulting Simeauli Tia'i. He was charged in Count One with intentionally or knowingly causing serious bodily injury to a disabled individual by hitting Tia'i with his hand or by twisting her arm with his hand, a first

degree felony. TEX. PENAL CODE ANN. § 22.04(a)(1), (e) (Vernon Supp. 2010). In Count Two, he was charged with intentionally or knowingly causing serious bodily injury to Tia'i by hitting her with his hand or by twisting her arm with his hand, a second degree felony. TEX. PENAL CODE ANN. § 22.02(a)(1), (b) (Vernon Supp. 2010). He was charged in Count Three with intentionally or knowingly causing bodily injury to Tia'i, a disabled individual, by choking her with his hand, by hitting her with his hand, or by twisting her arm with his hand, a third degree felony. TEX. PENAL CODE ANN. § 22.04(a)(3), (f) (Vernon Supp. 2010).

The jury acquitted appellant of the first degree felony alleged in Count One but convicted him of the second degree felony alleged in Count Two. With respect to the third count, the jury only found appellant guilty of the lesser included offense of assault causing bodily injury, a Class A misdemeanor. TEX. PENAL CODE ANN. § 22.01(a)(1), (b) (Vernon Supp. 2010). After the trial court received the jury's verdict on guilt/innocence, the State announced in open court that it would waive any further proceedings on Count Three based upon its belief that the lesser included offense found by the jury also constituted a lesser included offense of the offense alleged in Count Two. The trial court accepted the State's waiver on Count Three and proceeded to punishment only on Count Two.

Tia'i is from American Samoa. She was twenty-four years old at the time of trial in 2008. She moved to Texas in 2003 from American Samoa to live with her older sister, Mafatu Moi, after their mother died. Tia'i resided with Moi at her apartment located at the Parkside Townhomes in Arlington. Dr. Helen Ferguson, a psychologist with MHMR of Tarrant County, testified that Tia'i is mildly mentally retarded based upon her IQ score of 67. Moi testified that Tia'i's native language is Samoan.

Tia'i identified appellant at trial as her attacker. She testified that she only knew him by the name "Midas." She met him one day in the parking lot of the apartment complex when he was working on his car as she was walking by. Tia'i testified that appellant offered to be her "secret friend" during this initial meeting after he learned that she was single. He also showed her where he lived in the complex. Tia'i subsequently went to appellant's apartment on multiple occasions to visit him. She testified that they engaged in sexual activity during these visits. During one of these visits, appellant told Tia'i that he was behind on his rent. In response to his request for financial assistance, Tia'i discussed asking for financial help for appellant from her church.

2

Tia'i ultimately decided not to ask her church for financial assistance for appellant. On the morning of Sunday, November 19, 2006, Tia'i went to appellant's apartment to tell him that she would not be able to help him with his finances. In this regard, Tia'i testified that appellant told her that this was the last day for him to raise the money that he needed in order to avoid eviction. Tia'i testified that appellant became angry with her when she told him that she would not be able to help him raise the funds and that he called her a "liar" and a "bitch." He then grabbed her by the neck with both of his hands and choked her. Appellant subsequently threw Tia'i against a wall, causing her to fall on the floor on top of her left arm. She testified that her left arm began to hurt "pretty bad" at this point and that she believed it was broken. Appellant subsequently permitted Tia'i to leave his apartment after she promised to not tell her sister about the attack and to provide appellant with the money that he was seeking. The orthopedic surgeon that treated Tia'i testified that she suffered a fractured humerus bone in her left arm that he characterized as a serious bodily injury because she suffered a loss of function over a protracted period of time with a possibility that the loss of function would be indefinite.

Wendy Haines was the manager of Parkside Townhomes in November 2006. She testified that appellant had resided in apartment no. 2003 since November 2005. This is the same apartment that Tia'i identified as the apartment where "Midas" lived. Haines stated that appellant became delinquent on his rent in October 2006. She filed eviction proceedings against him on October 27, 2006, and she obtained an order for eviction on November 6, 2006. She obtained a writ of eviction on November 20, 2006, (the day following the assault) which the constable's office enforced on November 22, 2006, by supervising the removal of appellant's furniture from the apartment.

*Variance Between Indictment and Proof*

Appellant asserts in his third issue that the evidence was legally insufficient to support his conviction because the evidence offered at trial varied from the facts alleged in the indictment. Specifically, Count Two of the indictment alleged that he caused serious bodily injury to Tia'i by hitting her with his hand or by twisting her arm with his hand. Appellant directs our attention to the evidence that Tia'i's arm was broken as a result of being thrown against a wall and falling to the floor.

When a defendant bases a legal sufficiency challenge on an alleged variance between the allegation in a charging instrument and the proof at trial, we evaluate the evidence against the

3

elements of the offense as defined by the hypothetically correct jury charge for the case. *Fuller v. State*, 73 S.W.3d 250, 252 (Tex. Crim. App. 2002); *Gollihar v. State*, 46 S.W.3d 243, 255-56 (Tex. Crim. App. 2001); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A variance between the charging instrument and the proof at trial will only result in legally insufficient evidence when the variance is a material variance. *Fuller*, 73 S.W.3d at 253; *Gollihar*, 46 S.W.3d at 257. A variance will be construed to be a material variance when the variance deprives the defendant of notice of the charges or when the variance subjects the defendant to the risk of later being prosecuted for the same offense. *Fuller*, 73 S.W.3d at 253; *Gollihar*, 46 S.W.3d at 257.

The State has cited *Matthews v. State*, No. 07-07-0482-CR, 2008 WL 4889991 (Tex. App.—Amarillo Nov. 13, 2008, no pet.) (mem. op., not designated for publication), as a case involving a similar variance. The indictment in *Matthews* charged the defendant with assault by grabbing the victim's arm and twisting it and by grabbing her by the throat. *Id*. at *2. The evidence indicated that the defendant injured the victim by grabbing her around the ribs while holding her arms down and squeezing very tightly. *Id*. The court determined that this variance did not constitute a material variance under *Fuller* and *Gollihar*. It based its determination on the substantive elements of assault – that the defendant intentionally, knowingly, or recklessly caused bodily injury to another. *Id*. at *3. The court held as follows:

> The fact that the State alleged a factual method of appellant's causing the pain that was at odds with the proof at trial does not create a material variance. The culpable conduct was alleged in a manner to give appellant notice of the crime he was called upon to defend, an assault of the named victim on the alleged date in question. Further, appellant has never claimed that he did not know that he was defending himself against a charge of assault nor has he ever claimed surprise at the proof or allegations. Finally, since the entire record is reviewed in the case of a claim of double jeopardy, in the event of subsequent prosecution, appellant is not endangered of subsequent prosecution for the same culpable conduct. *See United States v. Apodaca*, 843 F.2d 421, 430 n. 3 (10th Cir.), *cert. denied*, 488 U.S. 932, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988).

*Id*.

We conclude that the court correctly analyzed the variance in *Matthews* under the holdings in *Fuller* and *Gollihar*. The circumstances in *Matthews* are analogous to the variance in this appeal. Count Two of the indictment charged appellant with the substantive elements of intentionally or knowingly causing serious bodily injury to Tia'i. The indictment sufficiently

4

informed appellant of the charges to allow him to prepare an adequate defense and to defeat an attempt to subsequently prosecute him for the same offense. The variance at issue is not material because it only concerned the method by which appellant caused the serious bodily injury. Appellant's third issue is overruled.

*In-Court Identification*

Appellant asserts in his first issue that the trial court erred in overruling his motion to suppress Tia'i's in-court identification of him as her attacker based upon an impermissibly suggestive pretrial photo lineup. The trial court conducted a pretrial hearing on appellant's motion. Detective Becky Szatkowski of the Arlington Police Department testified that Tia'i initially provided her with the attacker's nickname and apartment number. Detective Szatkowski then contacted the apartment manger to find out his actual name. She prepared a photo lineup containing appellant's Texas identification photo for Tia'i to review. Detective Szatkowski testified that she showed Tia'i the group of photos that she had assembled and asked Tia'i if she recognized anyone in the photos. Tia'i immediately identified appellant's photo as being a photo of the person she knew as "Midas" that broke her arm.

Tia'i appeared at times to give a different version of the manner in which Detective Szatkowski conducted the photo lineup. In this regard, she gave the following answers when questioned about the photo lineup:

Q. Did the detective tell you which person did that to you?

A. Yes, ma'am.

Q. How did – how did the detective tell you – did she tell you what picture to point to?

A. Yes.

Q. How did she tell you what picture to point to?

A. She was asking me, can you show me any of these pictures, um, that you can see, Midas in this pictures.

Q. Did she tell you which picture was Midas?

A. Yes.

Q. How did she tell – did you tell her what picture was Midas?

5

A. She was asking me. Show – she wanted me to just point my finger and if any of the pictures was lineup – if I remember – if I recognize how Midas looked like.

. . . .

Q. Did the detective tell you what picture she wanted you to point at?

A. Yes.

Q. And what picture did she tell you to point at?

A. A picture of Midas.

Q. Okay. Did she tell you which one was Midas?

A. Yes.

Q. How did she tell you which one was Midas?

A. She say can you show me where Midas [is] in this pictures.

Q. Okay.

A. So I went ahead and showed it to her.

Q. Okay. Before you told her which picture belonged to Midas, did she tell you which picture belonged to Midas?

A. Yes.

O. Okay. If she told you what picture belonged to Midas, why did you have to tell her?

A. I'm confusing.

. . . .

Q. Okay. When the detective showed you the pictures, did she say I'm pointing to Midas, pick out Midas?

A. No, that's not the way she – let me show her how Midas looked like.

Q. Okay. So when she brought you the pictures – did they look like this when she brought them to you?

A. Yes.

6

Q. What did she tell you?

A. For example, like you're my detective and I'm here and then you show me the pictures of all these mens, so. And then you ask me can you show me Midas in this pictures. So I went ahead and point finger right here and I told her.

Q. And when she showed it to you, did she use her finger and say pick him or pick him or pick him?

A. No.

Q. Okay. So did she tell you which picture belonged to Midas?

A. Yes, ma'am.

Q. Okay. How did she tell you which picture belonged to Midas? Did she tell you which picture belonged to Midas or did you tell her which picture belonged to Midas?

A. I'm the one who told her.

Q. You told her who Midas was?

A. Yes.

Q. Did she tell you who Midas was?

A. She didn't tell me who Midas was.

Appellant contends that the photo lineup was impermissibly suggestive based upon Tia'i's earlier responses that seemed to indicate that Detective Szatkowski told her at the outset which photo to select in the photo lineup. We disagree.

The question of whether a pretrial photo identification procedure was so impermissibly suggestive that it may have tainted an in-court identification is reviewed de novo. *Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009). We consider the totality of the circumstances in making this determination. *Id*. We apply a two-step inquiry: (1) whether the pretrial identification procedure was impermissibly suggestive and, if so, (2) whether the impermissibly suggestive procedure gave rise to a substantial likelihood of irreparable

misidentification at trial. *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Barley v. State*, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995).

A defendant bears the burden of establishing by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive. *Barley*, 906 S.W.2d at 33-34. When the trial court does not make express findings of fact and conclusions of law, we assume the court made implicit findings of fact in support of its ruling as long as such findings are supported by the record. *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005). Accordingly, we presume that the trial court determined that Detective Szatkowski did not conduct the photo lineup in an impermissible manner. This determination rested upon the trial court's evaluation of the credibility of Detective Szatkowski and Tia'i. At a suppression hearing, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). As the sole judge of the witnesses' testimony, the trial court was free to resolve the inconsistencies in Tia'i's testimony in support of Detective Szatkowski's version of the events. We note in this regard the difficulties that Tia'i had in communicating in English, her second language. Accordingly, the trial court did not err in determining that the pretrial identification procedure was not impermissibly suggestive.

Furthermore, the record does not show that the pretrial lineup gave rise to a substantial likelihood that Tia'i misidentified appellant as her attacker at trial. Tia'i had visited appellant in his apartment on multiple occasions prior to the assault. Their dealings with each other progressed to the point of a sexual relationship. Accordingly, appellant knew who assaulted her; she just did not know his actual name. The photo lineup simply served the purpose of confirming appellant's correct name. Appellant's first issue is overruled.

*Jury Note*

In his second issue, appellant contends that the trial court erred in its response to a note from the jury requesting to have a witness's testimony read back. The note from the jury stated as follows:

Jury Note #2

Some jury members remember hearing that Bob knocked on [appellant's door] on the morning of November 19th. Other jury members do not believe this was said. Can we please see the testimony from [Moi][1] regarding this point? Thank You

_____

[1]As referenced earlier, Moi is Tia'i's sister.

8

The trial court responded to the request in the following manner:

> In answer to your Jury Note Number 2, after having searched the Court Reporter's notes, there was no testimony found regarding the area in dispute in [Moi's] testimony. Please refer to the Charge of the Court, and continue your deliberations.

"Bob" is Moi's boyfriend. Tia'i testified that Bob went to appellant's apartment on the morning of the assault and that "[appellant] wasn't there." Moi, however, did not testify about Bob going to appellant's apartment. Accordingly, the trial court instructed the jury that there was no testimony from Moi about Bob going to appellant's apartment. Appellant contends that the trial court erred by not providing the jury with Tia'i's testimony on this subject instead.

TEX. CODE CRIM. PROC. ANN. art. 36.28 (Vernon 2006) provides:

> In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other.

When the jury asks that certain testimony be reread, the trial court must first determine if the request is proper under Article 36.28. *Howell v. State*, 175 S.W.3d 786, 790 (Tex. Crim. App. 2005) (citing *Moore v. State*, 874 S.W.2d 671, 673 (Tex. Crim. App. 1994)). A request for testimony is proper under Article 36.28 if it reflects that the jurors disagree about a specified part of testimony. *Id*. If the request is proper, the trial court must interpret the communication, decide which sections of the testimony will best answer the inquiry, and then limit the rereading accordingly. *Brown v. State*, 870 S.W.2d 53, 55 (Tex. Crim. App. 1994). The trial court's decision will not be disturbed unless a clear abuse of discretion and harm are shown. *Id.*; *see also Howell*, 175 S.W.3d at 790.

The jury only requested that Moi's testimony be read back. The trial court did not abuse its discretion by not providing the jury with testimony from other witnesses when the jury specifically limited its request to one witness's testimony. When the jury requests the reading of only a specific and limited portion of testimony, the trial court does not abuse its discretion by providing only the requested information. *See Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994); *Jones v. State*, 706 S.W.2d 664, 667 (Tex. Crim. App. 1986). The trial court correctly informed the jury that Moi did not testify about the matter in disagreement. Had the

jury wanted to hear the testimony of additional witnesses on this question, it could have asked the trial court in a subsequent jury note. Appellant's second issue is overruled.

*Clerical Error in Trial Court's Judgment*

The trial court's judgment states that the jury assessed appellant's punishment. The reporter's record indicates that the trial court actually assessed appellant's punishment. We modify the trial court's judgment to correct this clerical error.

*This Court's Ruling*

The judgment of the trial court is modified to reflect that the trial court assessed punishment. As modified, the judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


December 16, 2010

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

10